THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MCS HEALTH MANAGEMENT OPTIONS, INC.

      Plaintiff

          v.

CARLOS R. MELLADO LOPEZ, ET AL.

      Defendants

Civil Case No. 14-1223 (PG)

## OPINION AND ORDER

This case arrived before this court after a labyrinthine journey through the administrative halls of the Office of the Patient's Advocate of Puerto Rico ("OPS" by its Spanish acronym)[1]. The defendants clamor that it doesn't belong here. The plaintiff paints a different picture; one where proceedings were tainted with such bureaucratic hurdles and biased determinations that only under the microscope of federal review could their claims be rightfully assessed.

With the threat of a $1.7 billion fine hanging like the sword of Damocles, MCS Health Management Options, Inc. ("MCS HMO") sought an Emergency Motion for Temporary Restraining Order and a Preliminary Injunction. The Court granted in part the TRO and held a hearing on the preliminary injunction request.

The unprecedented $1.7 billion fine proposed would make it the largest in the history of Puerto Rico yet this case poses additional legal issues that extend beyond a mere exercise in arithmetic. With that in mind and after examining the parties' pleadings and revisiting their statements at the hearing, the Court **GRANTS** MCS HMO's Request for a Preliminary Injunction.

    I.    FACTUAL AND PROCEDURAL BACKGROUND

In the spirit of brevity, we highlight only the most pertinent facts and incidences from the mile-long administrative record.

    **1. The OPA proceedings**

    **A. The investigative phase**

---

[1] OPS later became OPA through Act No. 77 of July 24, 2013 of the Commonwealth of Puerto Rico, P.R. LAWS ANN. tit. 1, § 741 *et seq.*(2013) ("Act No. 77").

On October 14, 2010 MCS HMO executed a contract with the Puerto Rico Health Insurance Administration (called "ASES" by its Spanish initials). ASES is a public corporation created by virtue of Act No. 72 of September 7, 1993, P.R. LAWS ANN. tit. 24, § 7001 *et seq.* (1993), to implement the sweeping health reform orchestrated by then-governor Pedro Rosselló. ASES is charged with, among other things, managing the public funds to operate the Commonwealth of Puerto Rico's state-run health insurance plan, commonly known as "Mi Salud." As part of the contract between MCS HMO and ASES, (the "Contract"), the former would act as the insurance provider of "Mi Salud" for almost 850,000 participants in several regions of the Island. See Docket No. 1-1 at page 73.

As the business relationship between MCS HMO and ASES was coming to an end, the OPA caught wind of some alleged irregularities. Admittedly alerted by some reports in the local press that denounced the termination of the Contract without prior notification, the OPA initiated an investigative proceeding against MCS HMO and ASES. See Docket No. 1 at ¶ 9.

To put things in context, the OPA is an office within the Executive Branch responsible for overseeing and enforcing the provisions of the Bill of Rights and Responsibilities of the Patient ("Patients' Bill of Rights").[2] As part of its mandate[3], the OPA keeps on eye on insurance providers to make sure that the health-related services administered to participants of "Mi Salud" complies with federal and state regulations. To achieve those ends, the OPA passed Regulation No. 7617 of November 21, 2008, "Regulation for the Implementation of the Provisions of Law No. 194" ("Regulation No. 7617").

Thinking that the Contract had ended abruptly without notification to either insured patients or the OPA itself, the latter issued an Order for Request of Information, Subpoena for Investigative Hearing and Notice of Infraction dated June 11, 2011. See Docket No. 1 at ¶ 9. The OPA was

---

[2] Public Law No. 194 of August 25, 2000, as amended, P.R. LAWS ANN. tit. 24, §§ 3041-3058.

[3] The OPS, created by virtue of Plan No. 1-2011 signed into law on June 22, 2011, was the brainchild of Governor Luis Fortuño's administration. Plan No. 1 was later repealed through Act No. 75 of July 24, 2013. Hence, the "new" OPA is effectively governed by Act No. 77.

particularly worried that the Contract's termination violated the patients' rights to: (1) continuity in the services and treatment; (2) access to healthcare; (3) timely notice of the Contract's expiration. See Docket No. 1-1 at page 4. The Court will refer to this as the "First Violation."

Defendants claim that while the investigation for the First Violation was ongoing, the press once again alerted the OPA of another potential irregularity on MCS HMO's part. It seems that MCS HMO sent a notice of cancellation of contract to all the 164 ob-gyns on its provider network effective August 1, 2011 but, *de novo*, failed to notify the insured patients, the OPA and even ASES. Id. As a result, approximately 528 pregnant women were allegedly left without health coverage. See Docket No. 1-1 at page 6. We will refer to this as the "Second Violation."

On September 7, 2011, the OPA entered an Order to incorporate the Second Violation into their original Request for Information. See Docket No. 1-1 at page 6. In the OPA's view, this Second Violation was two-fold. MCS HMO not only violated the right of notification but also the pregnant women's rights to freely select their healthcare provider. Because the cancellation forced the pregnant patients to choose another doctor outside the network-the argument goes- MCS HMO effectively eliminated their option to pick. See Docket No. 1-1 at page 22.

The OPA's Examining Officer José A. García held a hearing on September 19, 2011 to discuss MCS HMO'S alleged violations. See Docket No. 1-1 at page 6. To assess the impact of the cancellation of services, the Examining Officer also ordered the parties involved to inform whether any complaints had been filed by patients claiming the denial of services requested under Mi Salud. See Docket No. 1-1 at page 7. The OPA reported back that 690 complaints had been filed, while MCS HMO supposedly accounted for 522 complaints. See Docket No. 1-1 at page 21.

    (i)    **The $5.3 million fine**

On December 15, 2011, the Examining Officer rendered a Preliminary Investigative Report (the "Preliminary Report"). See Docket No. 1-1. The report concluded that, pursuant to Article 7 of the Patients' Bill of Rights and Article 11 of Regulation 7617, MCS HMO violated its duty to timely notify the insured patients and the OPA of the termination of services. See Docket No. 1-1 at page 21. In addition, the OPA found MCS

HMO responsible for cancelling the ob-gyn services without notification to the patients or to the OPA. See Docket No. 1-1 at page 22.

Relying on Article 19 of the Patients' Bill of Rights, the OPA announced its intention to levy a fine of $5,300,000.00 against MCS HMO. Article 19 provides, in pertinent part, that any insurer that does not comply with the provisions of the Patients' Bill of Rights "shall be guilty of an administrative fault and sanctioned by a fine of not less than five hundred dollars ($500) and not greater than five thousand dollars ($5000) for each instance or violation of the law." P.R. LAWS ANN. tit. 24, § 3057 (1993).

The amount of the fine was divided as follows:

(i)     $5,000 for failing to give patients 30-day advance notice of the cancellation of the Contract and an equal sum for violating those patients' right to the continuation of services, for a total of **$10,000.00**;

(ii)    **$10,000.00** for termination of the Mi Salud plan without advanced notification to the insured patients;

(iii)   $5,000.00 for each of the 528 pregnant women who were not notified 30 days in advance of the cancellation of the ob-gyn services, for a total of **$2,640,000.00**[4]**;**

(iv)    $5,000.00 for each of the 528 pregnant women who, because of the cancellation of services, were not allowed to freely choose their ob-gyns, for a total of **$2,640,000.00**;

(v)     **$5,000.00** for allegedly violating Article 11(E) of Regulation No. 7617 for failing to give the OPA 24-hour advance notice of the cancellation of the contracts with the ob-gyns in MCS HMO's General Provider Network; and,

(vi)    **$5,000.00** for violations to Article 11(E) of Regulation No. 7617 for not notifying the OPA within 24 hours prior to the cancellation of the Contract with ASES.

See Docket No. 1-1 at pages 23-26.

As expected, MCS HMO filed an opposition to the Preliminary Report refuting the findings and claiming that no fine should be imposed. See

---

[4] As to this infraction, the OPA cited Articles 7 and 17 of the Patients' Bill of Rights.

Docket No. 1-1 at pages 32-61. The Examining Officer did not reconsider his findings and issued a Final Investigative Report dated February 13, 2012 that reaffirmed the preliminary conclusions and the $5.3 million fine. See Docket No. 1-1 at pages 65-90.

### (ii)   The $1.7 billion fine

Why the proposed $5.3 million fine became $1.7 billion is unclear. After the OPA issued the Final Investigative Report, Deputy Health Advocate, Harry Negrón Judice, notified MCS HMO that it was referring the case for an administrative hearing prior to issuing a final Order or Resolution. See Docket No. 1-1 at page 91. The case was assigned to Examining Officer Orlando Montes, who set the hearing for March 19, 2012. See Docket No. 1-1 at pages 93-94.

By means of a Motion for Reconsideration, MCS HMO complained that the OPA did not follow the procedural path set forth on its own "Regulation for Administrative Procedures," Regulation No. 7558 of August 19, 2008 ("Regulation No. 7558"). See Docket No. 1-3 at page 98. According to MCS HMO, Section 10.2(7) of Regulation 7558 provides that the Final Investigative Report has to be submitted to the Patient's Advocate for review. Following that evaluation, the Patient's Advocate must issue an Order or Resolution and then hold an administrative hearing at the aggrieved party's request; not the other way around. Id. The Examining Officer sided with the plaintiff's view and issued an order stating that any hearing would have to take place after the OPA issued a final Order or Resolution. See Docket No. 1-4 at page 147.

While waiting for the OPA to issue its final determination on the Investigative Report, MCS HMO filed a Motion to Dismiss, the first of two. See Docket No. 1-3 at pages 107-123. In their opposition to the motion to dismiss, the OPA suggested that the proposed fine of $5.3 million be increased to $125 million. See Docket No. 21-12 at pages 13-14. Needless to say, the Motion to Dismiss was denied. See Docket No. 1-3 at pages 124-125.

The OPA did not follow its own recommendation and, in what seems to be a recurring theme in this case, increased the fine to $1,705,290,000.00 without much explanation. The Resolution, notified on September 5, 2012 and signed by Patient's Advocate Carlos Mellado Lopez, concluded that MCS HMO had incurred in violations to the Patients' Bill of

Rights and to OPA's Regulations.[5] See Docket No. 1-3 at page 126. The breakdown of the $1,705,290,000.00 administrative fine is as follows:

(1)   $1,000.00 (for each patient) for incurring in violations to Article 7 of the Patients' Bill of Rights when it allegedly terminated the Mi Salud Plan without prior notification and $1,000.00 for violating Article 11 of Regulation No. 7617, multiplied by each of the 848,841 beneficiaries of Mi Salud, for a total of **$1,700,000,000.00;**

(2)   $5,000.00 for each of the 528 pregnant women who were not notified of the termination of the Contract with the ob-gyns, for a total of **$2,640,000,000.00;**

(3)   $5,000.00 (for each patient) for violating the rights of the pregnant women to choose freely their healthcare providers, for a total of **$2,640,000,000.00;**

(4)   **$5,000.00** for cancelling the ob-gyn contracts; and,

(5)   **$5,000.00** for failing to notify the OPA of the cancellation of the Mi Salud Plan.

See Docket No. 1-4 at pages 143-144.

The letter apprised MCS HMO of its right to request reconsideration within twenty days (20) from the date of notification but said nothing about its right to request a hearing. Id. MCS HMO cried foul and promptly asked the OPA to amend the Resolution and to set an administrative hearing. See Docket No. 1-4 at pages 146-152. This particular request proves to be important because, later on, the OPA would allege that MCS HMO kicked-started the adjudicative proceedings before the agency when it claimed that it was entitled to a hearing.

After MCS HMO's opportune request, the OPA issued an Amended Resolution to advise the plaintiff that it was entitled to request an administrative hearing. See Docket No. 1-4 at page 174. Though the hearing was originally set for October 15, 2012, it has yet to take place. Through a combination of continuances requested by the parties and postponements resulting from several interlocutory appeals, the hearing has been pending for more than two years.

---

[5] Specifically, the Resolution charges violations to Articles 6 and 7 of the Patients' Bill of Rights and Articles 10 and 11 of Regulation No. 7617.

(iii)   **The Adjudicative Proceeding**

From this point on, the proceeding morphed from investigative to adjudicative. What ensued was a flurry of discovery-related motions and evidentiary disputes.

The bulk of MCS HMO's filings can be divided into two main issues. First is their claim that the OPA lacks jurisdiction to hear the case or, more accurately, that it only has jurisdiction to rule over any violations to the duty of notification to the OPA itself. Their first Motion to Dismiss argues that point.

Second is their request for discovery in lieu of the administrative hearing. Both were struck down by the OPA and led to a part of this case's procedural landscape that is particularly pertinent to the issues before this Court: the appellate history.

On March 15, 2012, MCS HMO filed a first Motion to Dismiss alleging that it was ASES, and not the OPA, the entity that had jurisdiction to adjudicate its claims. See Docket No. 1-6 at page 236. The OPA disagreed with that view. Id. A second motion followed on October 18, 2012, as did the OPA's denial of the same. See Docket No. 1-6 at page 238. While the motion for reconsideration was pending, MCS HMO filed an interlocutory petition for judicial review before the Puerto Rico Court of Appeals. See Docket No. 1-6 at pages 238-239.

Before the Court of Appeals had notified its Resolution, the OPA scheduled a full hearing on the merits for April 26, 2013. See Docket No. 1-6 at page 261. Shortly after, the Court of Appeals issued a Resolution stating that it lacked jurisdiction because the writ was premature. See Docket No. 1-6 at page 260. Prompted by the Court of Appeal's decision and with less than a week to go before the April 26, 2013 hearing, MCS HMO took its pleas to the Puerto Rico Supreme Court. See Docket No. 1-7 at page 281.

While the petition for writ of certiorari and motion in aid of jurisdiction were pending before the Puerto Rico Supreme Court, the OPA Examining Officer issued an order dated April 22, 2013 concluding, *inter alia*, that MCS HMO was not entitled to conduct discovery prior to the hearing on the merits.[6] See Docket No. 1-7 at pages 299-306. The next

---

[6] The hearing was continued for May 24, 2013. See Docket No. 1-7 at page 314.

day, the Supreme Court denied the petition for writ of certiorari and the motion in aid of jurisdiction. See Docket No. 1-7 at page 298.

Soon enough, MCS HMO was back pleading its case before the Puerto Rico Court of Appeals. See Docket No. 1-7 at page 307. This time around, MCS HMO decried the OPA's determination that it was not entitled to discovery. MCS HMO argued that it would not be able to defend itself properly without it and asked the Court of Appeals for several remedies that included staying the administrative proceedings; revoking the April 22, 2013 Order and returning the case to the OPA with instructions that discovery be allowed. See Docket No. 1-8 at page 344.

The Court of Appeals ultimately ruled, inter alia, that MCS HMO's claims of constitutional violation were premature because the administrative proceedings of an adjudicative nature "were just beginning." See Docket No. 1-11 at page 492. After its request for reconsideration was denied, MCS HMO knocked at the doors of the Puerto Rico Supreme Court. See Docket No. 1-12 at page 513. On March 7, 2014, the highest court denied MCS HMO's request for writ of certiorari. See Docket No. 1-13 at page 553.

On March 17, 2014, MCS HMO filed a first motion for reconsideration and a motion to stay the OPA proceedings. See Docket No. 1-13 at pages 546-553. Both were denied. Id. On March 11, 2014, MCS HMO filed a second and last motion for reconsideration before the Puerto Rico Supreme Court. See Docket No. 1-13 at pages 565-571. That motion was pending when MCS HMO initiated the federal action. However, on April 28, 2014, the Supreme Court notified their resolution denying the second motion for reconsideration. See Docket No. 21-21 at pages 1-3.

**2) The ASES proceedings**

Even though ASES is not a party to this case, the Court deems pertinent to mention a parallel administrative proceeding against MCS HMO initiated by ASES shortly after the OPA's Notice of Infraction. In a nutshell, back in October 31, 2011, ASES filed a letter of intent to fine MCS HMO for the sum of $19,040,000.00 for violations in the cancellation of the ob-gyn contracts. See Docket No. 1-6 at page 234. The record is silent as to whether or not the fine was finally imposed.[7]

---

[7] If it is the case that ASES imposes the forfeiture, it would expose MCS HMO to

### 3) **The federal case**

On March 17, 2014, the plaintiff filed the Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction against Carlos R. Mellado Lopez both in his personal and in his official capacity as Patient's Advocate. See Docket No. 1. MCS HMO also sued Karen L. Garay Morales, an independent contractor of the OPA, for her role as Examining Officer in the administrative adjudication that gave rise to the suit. The Court will refer to Mellado and Garay, collectively, as the defendants.

MCS HMO asks that the Court issue a declaratory judgment and grant permanent injunctive relief. Specifically, MCS HMO seeks that the Court:

a) Declare that the manner in which OPA fines are collected, maintained and disbursed under the Charter of Patient's Rights and Responsibilities and Regulation Number 7617 is unconstitutional;

b) Declare that the procedure used by the OPA to levy a $1.7 billion fine against MCS HMO subjects it to a biased process that would deprive MCS HMO of its liberty and/or property without due process and cause irreparable harm;

c) Issue a preliminary injunction enjoining defendants from imposing any fine, issuing any order regarding penalties or proceeding any further with any administrative penalty against MCS HMO; and,

d) Issue a permanent injunction enjoining defendants from imposing any fine or proceeding any further with any administrative penalty action against MCS HMO.

On March 18, 2014, the Court granted in part the motion for TRO and set the show cause hearing on why the preliminary injunction should not be granted for March 31, 2014. See Docket No. 10. After the preliminary injunction hearing had concluded, defendants filed a "Motion to set aside temporary restraining order and for dismissal." See Docket No. 18.

As agreed by the parties during the preliminary injunction hearing, the Court extended the TRO until such time as an Opinion and Order on the request for preliminary injunction was issued. See Docket No. 19. Moreover, the parties were granted thirty (30) days to submit

---

administrative penalties for the same alleged violations in two different agencies.

simultaneous briefs on the matters addressed at the hearing. Id. MCS HMO submitted their post-trial brief on April 30, 2014. See Docket No. 20. At defendants' request, we take their motion at Docket No. 18 to constitute their post-hearing brief. See Docket No. 31 at ¶ 3.

Having explained where the case stands, procedurally speaking, we move on to the parties' arguments.

## II.   THE PARTIES' ARGUMENTS

### A. MCS HMO

MCS HMO seeks to enjoin the administrative proceedings under which it could be the subject of a $1,705,290,000.00 fine arguing that its right to due process is at stake. MCS HMO's allegation is that the Examining Officers designated by the OPA have conflicts of interest and that the agency has such deeply-rooted structural bias that it cannot render a decision based on sound principles under the Due Process Clause.

First, MCS HMO claims that the OPA has a direct pecuniary interest in the outcome of the proceedings creating an unconstitutional structural bias. According to MCS HMO, under the OPA's enabling act, a Special Fund was created in the Treasury Department of the Commonwealth of Puerto Rico. All the fines that the OPA imposes are deposited in that fund and used exclusively at the OPA' discretion for paying its expenses, including the payment of the Examining Officer's fees. This "overwhelming and direct pecuniary interest," as MCS HMO calls it, creates a constitutionally-fatal structural bias. See Docket No. 1 at page 17.

Next is MCS HMO's claim of due process violations in the proceedings themselves. MCS HMO avers that because the examining officers are independent contractors paid by the OPA and hired at will, they owe a contractual duty of loyalty to the agency and an unwritten allegiance as well. This structural bias leads to actual bias against MCS HMO, or so they say. It is no coincidence, they point out, that most, if not all of the decisions made by the officers and agents of the OPA favor the latter at the expense of MCS HMO's rights.

MCS HMO details other specific instances of actual bias that include procedural blunders; deficient notifications; the failure to produce the complete administrative record; the increase in the suggested fine from $5.3 million to $125 million to $1.7 billion and the rotund denial of the discovery requested. As to this last point, MCS HMO avers that the denial

of discovery is a violation of OPA's internal regulations, the Puerto Rico Administrative Procedure Act and the right not to be deprived of property without due process of law.

Aside from the bias issue, MCS HMO also argues that the size of the fine alone makes it unconstitutional because it violates the Due Process and Excessive Fines Clauses. MCS HMO posits that all these elements taken together point to one inescapable conclusion: that it is suffering an irreparable injury that can only be addressed by this Court's intervention.

**B. The defendants**

The defendants do not refute each of MCS HMO's factual contentions because, as they see it, the Court's consideration of the preliminary injunction petition is barred by the *Younger* and *Rooker-Feldman* abstention doctrines.[8] In short, because plaintiff has immediate interlocutory relief available in the state court system, this Court must abstain from ruling on the merits of MCS HMO's claims. Furthermore, defendants argue that the quasi-judicial administrative proceedings before the OPA have not concluded and thus, any penalty is speculative at best.

As to the possibility that there might be "extraordinary circumstances" in this case that warrant an exception to the general rule that federal courts should not intervene in ongoing state proceedings, defendants argue that MCS HMO's "unsupported allegations" do not overcome the presumption against the existence of bias. See Docket No. 18 at page 9.

The first order of business for defendants is to rebut the idea that there is a structural bias because any fines that the OPA collects are deposited in a special fund that is used for its operating expenses. Because Act No. 75 of July 24, 2013 ("Act No. 75") amended Act No. 300 of October 20, 2012 ("Act No. 300")[9] (the statute providing for the creation of the Special Fund), it is no longer required that administrative fines be deposited in such a way. No financial benefit equals no bias, defendants aver. Also, since the Examining Officers have no proprietary interest in the investigation or adjudication of the case, their actions

---

[8] These doctrines are derived from <u>Younger v. Harris</u>, 401 U.S. 37(1971) and <u>Rooker v. Feldman Trust Co.</u>, 263 U.S. 413 (1923), respectively.

[9] P.R. Law Ann. tit. 3, Ap. XVII, § 14.

cannot be said to be one-sided in favor of the OPA.

Regarding the Eight Amendment claims, defendants dismiss plaintiff's emphasis on the amount of the proposed administrative fine as "hyperbolic rhetoric." See Docket No. 18 at page 16. Furthermore, they argue that the amount of the forfeiture is not "grossly disproportionate" to the gravity of the violations that MCS HMO committed. See Docket No. 18 at page 20.

Finally, defendants attempt to lodge a perfunctory 12(b)(6) argument that is so procedurally misplaced that this Court will not even discuss it except to state that the plaintiff's allegations far surpass the "plausible claim for relief" standard set forth in Fed. R. Civ. P. 12(b)(6) and interpreted in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009).

### III.  THE RULE OF LAW

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (citing WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, CIVIL 2d § 2948) (emphasis ours). The determination of whether this burden has been met rests within the realm of the court's discretion. See Deckert v. Independence Shares Corp., 311 U.S. 282, 290 (1940).

The standard for issuing a preliminary injunction is oft-quoted a four factor test: (1) the likelihood of success on the merits; (2) the potential for irreparable injury; (3) a balancing of the relevant equities most importantly, the hardship to the nonmovant if the relief issues as contrasted with the hardship to the movant if relief is withheld; (4) the effect on the public interest of a grant or denial of the relief requested. See New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir. 2002); Ross-Simons of Wardwick, Inc. V. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). "Of these four factors, the probability-of-success component [is] … critical in determining the propriety of injunctive relief." Lancor v. Lebanon Housing Authority, 760 F.2d 361, 362 (1st Cir.1985). The overseeing appellate court has called the likelihood of success factor the "sine qua non" of the preliminary injunction test. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993); see also SEC v. Fife, 311 F.3d 1, 8 (1st Cir. 2002).

In addition, the potential for irreparable injury criteria "must not be assumed, it must be demonstrated … speculation injury does not constitute a showing of irreparable harm." Narragansett Indian Tribe v. Guilbert, 934 F.2d at 6-7 (internal citations omitted). The comparable hardship factor requires the court to examine, and perform a comparison between the injuries suffered by plaintiff outweighing any harm which granting injunctive relief would inflict on the defendant. See DeNovellis v. Shalala, 135 F.3d 58, 77 (1st Cir.1998); Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009 (1st Cir.1981). The final and fourth criterion, namely, the effect on the public interest, is measured by whether the public interest would be better served by issuing than by denying the injunction. See Massachusetts Coalition of Citizens with Disabilities, et al., v. Civil Defense Agency and Office Emergency Preparedness, 649 F.2d 71, 74 (1st Cir.1981.)

**IV.  DISCUSSION**

Because the key to the gates of federal court for this plaintiff are shaped by the tenets of Younger v. Harris, 401 U.S. 37 (1971), the Court will first address the *Younger* doctrine and the appropriateness of federal intervention in these proceedings.

**A. The *Younger* doctrine and the *Gibson* "bias" exception**

The *Younger* abstention posits that, as a general rule and in the interest of comity, federal courts should refrain from interfering with pending judicial proceedings, except under special circumstances. Younger, 401 U.S. at 54.

The Supreme Court has expressed that *Younger* applies "when the requested relief would interfere (1) with an ongoing state judicial proceeding; (2) that implicates an important state interest; and (3) that provides an adequate opportunity for the federal plaintiff to advance his federal constitutional challenge." See Massachusetts Delivery Ass'n v. Coakley, 671 F.3d 33, 40 (1st Cir. 2012)(citing Rossi v. Gemma, 489 F.3d 26, 34-35 (1st Cir. 2007)). Though the *Younger* doctrine initially applied only to state criminal prosecutions, its scope is now more far-reaching extending to "comparable state administrative proceedings that are quasi-judicial in character and implicate important state interests." See Maymó-Meléndez v. Alvarez-Ramírez, 364 F.3d 27, 31 (1st Cir. 2004); see also Middlesex County Ethics Committee v. Garden State Bar Ass'n, 457

U.S. 423, 432 (1982).

The defendants claim that the *Younger* three-part test is satisfied. For starters, the proceedings before the OPA are quasi-judicial because they seek to impose fines "after notice and hearing." <u>Maymo</u>, 364 F.3d at 32. That the ongoing state proceeding implicates an important state interest is also undisputed. As defendants point out, the OPA was created to enforce compliance with the Patients' Bill of Rights. Therefore, the state's interest in regulating the matters pertaining to the health and well-being of its citizens is not in question.

That leaves us with the third prong, to wit, whether the state proceedings provide an adequate opportunity for plaintiff to advance his federal constitutional challenge. The issue is whether MCS HMO has had "the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." <u>Esso Standard Oil v. Cotto</u>, 389 F.3d 212, 218 (1st Cir. 2004) (citing <u>Gibson</u>, 411 U.S. at 577).

Plaintiff claims that even if we were to determine that this case falls squarely on *Younger* territory, an exception is warranted because extraordinary circumstances exist. <u>Younger</u>, 401 U.S. at 53-54 (Holding that even if all three requirements are met, abstention is still not proper in certain "extraordinary circumstances" or "unusual situations"). For example, courts have carved out an exception to *Younger* where "core constitutional values are threatened during an ongoing state proceeding and there is a showing of irreparable harm that is both 'great an immediate.'" <u>Maymó-Meléndez</u>, 364 F.3d at 37 (citing <u>Younger</u>, 401 U.S. at 46.)

The exception that MCS HMO invokes is the one set forth in <u>Gibson v. Berryhill</u>, 411 U.S. 564 (1973), dubbed the *bias* exception. It states that federal courts should not abstain under *Younger* where an administrative body is found incompetent by reason of bias to adjudicate the issues pending before it. <u>Gibson</u>, 411 U.S. at 564.

In support of its argument that the bias exception applies herein, plaintiff directs the Court to a line of cases that arrived to federal court by way of the Puerto Rico Environmental Quality Board ("EQB"). The *ESSO* cases provide a framework for the interpretation of the *Younger* doctrine and its *bias* exception in the context of administrative proceedings before the Commonwealth of Puerto Rico.

The *Esso* cases concern a $75,960,000.00 fine that the Environmental Quality Board sought to impose against Esso for the damages caused by a fuel spill and other regulatory violations in a gas station located in Barranquitas, Puerto Rico. See *Esso v. Mujica*, 327 F.Supp.2d 110, 113 (D.P.R. 2004). The EQB issued an administrative order directing Esso to show cause why it should not be fined. Id. at page 119. Esso requested that administrative hearings be conducted on the order to show cause. Id. While the administrative proceedings were taking place, Esso filed two appeals before the Puerto Rico Court of Appeals, one dealing with a discovery matter and the other requesting dismissal of the hearings on statute of limitations grounds. See *Esso v. Mujica*, 389 F.3d 212, 215 (1st Cir. 2004)("Esso I"). On both instances the court ruled that it did not have authority to review interlocutory decisions of an administrative agency under P.R. LAWS ANN. tit. 3, § 2172. Id.

Before the EQB had issued a final determination, Esso filed a suit in federal court and moved for a preliminary injunction. Like the plaintiff in this case, the Esso plaintiffs argued that the administrative proceedings were so marred by bias and due process violations that their constitutional rights were being undermined.

Despite finding that "the undisputed evidence presented by Esso regarding the EQB's handling of the case is sufficient to make any court sitting in equity pause," the district court ultimately concluded that Esso could not make a showing of irreparable injury. See *Esso v. Mujica*, 327 F.Supp.2d at 129. The reasoning was that Esso's request was premature because no final fine had yet been imposed. Moreover, the district court explained that Esso could still resort to the state judicial review process to vindicate any rights that could have been violated by the administrative entity. Hence, the district court found that *Younger*-mandated abstention was warranted.

Esso appealed. The court of appeals affirmed the district court's decision but on different grounds. That distinction is pertinent to our reasoning. The First Circuit concluded that Esso had failed to make a showing of irreparable harm, but not because of the availability of state judicial review of the final agency decision. Actually, the First Circuit agreed with Esso in that even if the final fine had not yet been imposed, Esso would suffer a "constitutional injury" "in being forced to continue

proceedings before a biased adjudicator." Esso, 389 F.3d at 220.

The Achilles' heel of Esso's case, said the First Circuit, was that proper judicial review of an interlocutory agency decision was available. In plain terms, the Court read *Gibson* as stating that the availability of **final** review does not diminish the constitutional injury inherent in appearing before a biased adjudicator but the availability of **interlocutory** relief just might do. On that rationale, the First Circuit affirmed the lower court's decision.

After that first unsuccessful attempt to secure injunctive relief, Esso followed the roadmap laid down in Esso I and sought interlocutory judicial review of its due process claims. The request was denied "on the basis that the (appeals) court lacked jurisdiction to consider Esso's interlocutory appeal." See Esso v. Freytes, 467 F.Supp.2d 156, 158 (D.P.R. 2006). Esso filed a renewed motion for preliminary injunction. Id. at 157. This time around, the district court granted the request because it found that "the lack of irreparable harm as found and defined by the First Circuit was thereby obliterated." Id.

Prompted by a motion for summary judgment filed by plaintiffs, the Court eventually granted the request for a permanent injunction. Id. at 169. Defendants once again appealed. Esso v. Freytes, 522 F.3d 136 (1st Cir. 2008)("Esso II"). In affirming the District Court's decision, the Court of Appeals embraced the *bias* exception two-prong test that requires petitioners to establish extreme bias on the state adjudicator's part and irreparable harm. Esso II, 522 F.3d at 143 (citing Gibson, 411 U.S. at 577).

With that background to set the stage, we go knee-deep into the *bias* exception analysis.

### 1. Bias

### (i)     Structural Bias

MCS HMO's position is that this case has all the components of both structural and actual bias. Defendants disagree, alleging that the record falls short of the types of structural bias found in the *Esso* cases.

The *Esso I* court gave great weight to the fact that the adjudicative body stood to benefit financially from any fine because those monies would flow directly to the agency's budget. Esso I, 389 F.3d at page 219. That the board members did not stand to gain personally did not ameliorate the

bias determination. Id. After all, the Court instructed, "a pecuniary interest need not be personal to compromise an adjudicator's neutrality." Id.

According to MCS HMO, the same budgetary model is present here. Article 14 of the OPA's enabling statute establishes that all the monies collected as a result of administrative fines are to be deposited in a special fund in the Treasury Department "for the exclusive benefit of [OPA] to cover part of their operating expenses and to provide direct service to the population it serves." See Article 14 of the Reorganization Plan No. 1 of 2011, as amended.

To the Esso I court, that would have been "sufficient under the [Gibson] rule to mandate disqualification" of the administrative adjudicator. Esso I, 389 F.3d at 219. Defendants, however, claim that MCS HMO's structural bias allegations fall flat because the OPA's enabling statute was repealed by Act No. 75. See Docket No. 18. According to defendants, the new law says nothing that could be construed to benefit the OPA financially from the proceedings of the fines imposed.

MCS HMO staunchly refutes defendants' argument. They claim that Act No. 75 only repealed the first article of Act No. 300, but did not affect the second and third articles. Being that the second article contains the provisions creating the special fund, the latter remains in effect.

A brief introductory course on the legislative history that the parties refer to seems fitting at this juncture. The OPS was created by virtue of Reorganization Plan No. 1, signed into law on June 22, 2011. Act No. 300 of October 20, 2012 amended Article 14 of the Reorganization Plan 1-2011. The purpose of the amendment was to give more resources to the Patient's Advocate to be able to carry out the public policy he was charged with implementing. See Statement of Motives of Act No. 300. Law 300 only had three articles. The first article amended Article 14 of the Reorganization Plan 1-2011 to provide that all the administrative fines levied by the OPA would be deposited in a Special Fund at the Treasury Department. The second article created the Special Fund. The third and final article amended Article 19 of Reorganization Plan 1-2011 to increase the amount of administrative fines that could be imposed. See Act No. 300. The Reorganization Plan 1-2011 would be short-lived. With the change in government came Act No. 75, which effectively repealed the Reorganization

Plan 1-2011.

On the same day that Act No. 75 was passed, the legislature enacted Act No. 77 to create the "new" OPA. Act No. 77 of July 24, 2013 does not refer by name to the "special fund" that had been created through Act No. 300. But MCS HMO alleges that it does so implicitly in Article 15 which states, in pertinent part:

> Any state or federal funds requested and received by the Office of the Advocates' administration, which are used for services this Office offers will be reversed and will be transferred to this new Office that under this Act is created, through the existent accounts in the Treasury Department and the Office of Management and Budget assigned to the Offices herein repealed, as applicable.

Act No. 77, Art. 15.

We find that the record is not fully developed as to the matter of whether the "special fund" still exists or not. Nevertheless, there are other circumstances present here that suggest structural bias, most notably, the selection process for the Examining Officers.

Similar to EQB Examiners in the *Esso* cases, the Examiners at the OPA are independent contractors who depend solely on the agency's willingness to assign cases to them and are paid on an hourly basis. See Docket No. 1-13 at page 585. MCS HMO provided copy of the contract between one of the Examining Officers assigned to their case, Carlos Santiago and the OPA. Id. The contract shows that Santiago agrees to act as Examining Officer "in the administrative hearing that [the OPA] assigns to him/her." See Docket No. 1-14 at page 586. Moreover, the contract in question provides that the Examining Officers must also "[r]epresent [the OPA] in designated matters" and "assist in the drafting of legal and administrative documents that are necessary for the furthering of the functions and duties of [the OPA]." See Docket No. 1-14 at page 587. Pursuant to the terms of the contract, the Examining Officer also owes an ethical duty of "absolute loyalty" to the OPA. See Docket No. 1-14 at page 594. The contract states that the Examining Officer will not have "conflict interests" in detriment to the OPA. Id.

We believe this set-up is conducive to bias. MCS HMO claims that during Carlos Santiago's tenure as Examining Officer, their requests were consistently denied with little legal support or findings of facts. See

Docket No. 1 at page 10. In fact, it was Santiago who denied MCS HMO's numerous discovery requests. MCS HMO also believes that the new Examining Officer, Karen L. Garay Morales, is exhibiting the same conduct.

The plaintiff claims that Ms. Garay scheduled a hearing on the merits that left them less than three weeks to prepare. <u>See</u> Docket No. 1 at page 20. To add insult to injury, she denied all their discovery-related requests pertaining to the hearing. <u>Id</u>. Also, MCS HMO points to an incident where the OPA contacted MCS HMO via telephone to request alternate dates for the evidentiary hearing to accommodate the OPA's outside counsel. <u>See</u> Docket No. 1-13 at page 559. Ms. Garay responded to MCS HMO's email supplying alternate dates and, in what can be best described as a forceful tone, scolded them for "requesting a continuance of the hearing" without presenting a formal written request. <u>See</u> Docket No. 1-13 at page 561. Seemingly unaware that the request for continuance was done for OPA's benefit, Ms. Garay also refused to take into account that MCS HMO's counsel was unavailable for several of the suggested dates. In that same email, Ms. Garay denies a series of motions filed by MCS HMO. It is not clear whether a formal notification of those rulings ensued. <u>Id</u>. at pages 561-62.

The court agrees with MCS HMO that, taken as a whole, these incidents show a bias in favor of the OPA. *Gibson* tells us that the question rests not so much on actual bias but on whether "in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him." <u>Gibson</u>, 411 U.S. at 571. We certainly see instances where the examiners might have fallen for that "possible temptation" here.

The structural bias indicators, however, do not stop with the Examining Officers. That the OPA acts as both prosecutor and judge, that is to say, that it investigates any wrongdoing and also acts as adjudicator of whether those wrongdoings violate its regulations, is also telling. The *Gibson* court took that factor into account and we follow their lead. <u>Gibson</u>, 411 U.S. at 571.

The sum of all these elements leads the court to a finding of structural bias.

     **(ii)    Actual Bias**

MCS HMO points to numerous reasons why the administrative proceedings at the OPA are also plagued by actual bias. Their arguments can be grouped into three categories. First, MCS HMO claims that it has suffered actual bias in the handling of its discovery requests and that the OPA has placed hurdle after hurdle to prevent any fruitful discovery in the case. MCS HMO complains that the agency has refused to provide the complete administrative record, particularly the copies of the hundreds of complaints allegedly filed by the insured patients against MCS HMO. [10] See Docket No. 21 at page 11. What little it provided, says the plaintiff, was released only a few days before the hearing on the merits and close to 7 months after its initial request. Id.

Examples of other discovery requests that have been denied include: (i) a copy of the recording of the investigative conference held on September 19, 2011 (Docket No. 1-5 at page 217); (ii) discovery regarding the allegations that 528 pregnant women were left without coverage; (iii) requests to issue a subpoena for 5 key witnesses (Docket No. 1 at page 3.)

Second, MCS HMO sustains that it has been the victim of arbitrary decisions during the course of the administrative proceedings. The plaintiff highlights numerous procedural missteps and deficiencies, such as the transfer of the administrative case to an Examining Officer before the issuance of a Final Order or Resolution, as the OPA's regulations require.[11] See Docket No. 21 at page 11 and Docket No. 1-3 at page 91. Another example is the deficient Resolution issued by the Patient's Advocate, which failed to notify MCS HMO of its right to request the commencement of a formal administrative adjudicate proceeding in clear violation of the OPA's own regulations. See Docket No. 21 at page 11 and Docket No. 1-3 at page 126. Similarly, the denial of MCS HMO's Motion to Dismiss did not contain any findings and did not advise MCS HMO of its right to request reconsideration of the OPA's decision. See Docket No. 1-8 at page 323. The list is rounded up by scheduling issues, particularly the incident discussed previously where the OPA allegedly sought to accommodate the agency's external counsel even though MCS HMO was not

---

[10] The OPA alleges that it received 690 complaints and that MCS HMO received 522 complaints. See Docket No. 1-9 at page 389.

[11]    Section 10.2 of Regulation No. 7558.

available on the suggested dates. See Docket No. 1-13 at pages 559-563.

But the proverbial "smoking gun" pointing to bias, says the plaintiff, is the fine itself. It is MCS HMO's contention that the exorbitant sum is, *per se*, evidence of the OPA's lack of impartiality. What's more, MCS HMO asserts that the increase from the initial $5.3 million to the suggestion of $125 million to the final proposed amount of $1.7 billion speaks volumes about the not-so hidden motives of the defendants.

In reading the OPA's submissions on the record, the court understands that the math behind the "final proposed amount" of $1,705,290,000.00 reflects the agency's view that the phrase "for each instance or violation of the law" in Article 19 of the Patients' Bill of Rights and Article 11 of Regulation No. 7617 means that any fine must be multiplied by each one of the insured patients. In other words, each one of the 848,841 patients represents a separate instance of violation. The OPA, however, does not explain how it arrived to this conclusion.

In responding to the plaintiff's allegations, the OPA took the approach of distinguishing this case from the *Esso* jurisprudence rather than countering with a fact-intensive rebuttal. For example, the agency avers that there was no evidence here of "improperly exerted pressure" from the Puerto Rico Senate or any other branch of government to rule one way or the other. See Docket No. 18 at page 13-14. The *Esso* cases, by contrast, give weight to such evidence in finding actual bias. Esso II, 522 F.3d at 148.

The defendants also discard MCS HMO's argument regarding the size of the fine, calling for the court to apply the test set forth in United States v. Bajakakian, 524 U.S. 321, 334 (1998). *Bajakakian* urges that the amount of the fine must be related to "the gravity of the offense that it is designed to punish." Id. at 334. In defendants' opinion, MCS HMO's violations more than justify the $1.7 billion forfeiture tag.

As to the crucial matter of discovery, the OPA's position is that, pursuant to Section 3.8(a) of the Administrative Procedure Act of Puerto Rico (known by its Spanish acronym "L.P.A.U."), a respondent only has a right to discovery in adjudication proceedings when those proceedings were initiated by the agency itself. See P.R. LAWS ANN. tit. 3, § 2158. The OPA avers that it did not initiate the process because the request for an

administrative hearing came from MCS HMO. See Docket No. 1-7 at page 303
and Docket No. 1-8 at page 317. Defendants, however, do not raise this
argument in their pleadings.

In any case, and without going into the merits of such an
interpretation—an analysis the court is not required to do at this
crossroad—it would seem unjust to suggest the imposition of such a large
fine without, at the very least, affording the aggrieved party the chance
to properly contest it.

"The time-honored phrase 'due process of law' expresses the
essential requirement of fundamental fairness." Gorman v. University of
Rhode Island, 837 F.2d 7, 12 (1st Cir. 1988). Courts have consistently
held that "notice" and "opportunity to be heard" are crucial elements of
procedural due process. Id. As far as hearings go, the person adversely
affected must be "afforded the opportunity to respond, explain and
defend." Id.

The First Circuit has echoed these concerns:

> Few principles of law, applicable as well to the
> administrative process, are as fundamental or well
> established as "a party is not to suffer ... without an
> opportunity of being heard." For the American, in the words
> of Justice Frankfurter, " [a]udi alteram partem—hear the
> other side!—a demand made insistently through the
> centuries, is now a command, spoken with the voice of the
> Due Process Clause of the Fourteenth Amendment....

Id.(quoting Caritativo v. California, 357 U.S. 549, 558
(1958)(Frankfurter, J., dissenting)(internal citations omitted).

In listening to that due process mandate, this court grapples with
the notion that a party could stand to face a $1.7 billion fine and be
unclad to battle it without the shield of discovery.

By the same token, after reviewing MCS HMO's list of grievances
through the spectrum of the Esso cases, we find that there are enough
procedural irregularities and arbitrary determinations to make the
inference that the OPA's Examiners is not an impartial adjudicator in this
case.

Starting with the fine itself, the court agrees with MCS HMO that the
way the final proposed amount rose to $1.7 billion leaves behind more
questions than answers. Why did the Examining Officer multiply the fine by
the total number of beneficiaries? The defendants do not provide a solid

rationale for the lawful basis of this decision.

The violations regarding the alleged cancellation of the ob-gyn contracts are even more baffling. The OPA makes a finding that 528 women were left without insurance and were not able to choose their providers. Yet, nowhere does the OPA detail how or why it reached such a conclusion. There is no indication on the record that the OPA interviewed these women or that it made a case-by-case determination of whether they actually were put in the bind of choosing a doctor against their will. In fact, it seems that the Examining Officers' determinations gave more weight to news articles than to actual findings of facts made by the agency and its officers.

In addition, despite the defendants' efforts to minimize the importance of the amount of the fine, we agree with the *Esso II* court in that its gargantuan size "only intensifies the appearance of bias infecting the proceedings." Esso II, 522 F.3d at 147. As a side note, the amount of the fine in *Esso II* was $76 million, less than five percent of this case's $1.7 billion.

Continuing with the Examining Officers, the court finds that, just as in *Gibson*, they might have "preconceived notions" that taint the proceedings. Gibson, 411 US at 571. From defective notifications, (*see e.g.* Docket No. 1-3 at page 126), to the lack of supporting evidence in many of their determinations (such as the calculation of the "final" proposed fine), we find that the administrative process has been marked by inconsistencies and general unfairness.

Before ending the discussion on this section, the court would like to highlight a particular portion of the defendants' arguments on their Motion to Set Aside. See Docket No 18.  In reaffirming once again that MCS HMO has "admitted most, if not all, of the violations alleged,"–a rhetoric that defendants have failed to sustain with evidence–it added that MCS HMO's recognition of its faults would "undoubtedly be taken into consideration by the hearing examiner and that will most probably result in a fine much lower than the one proposed by the Patient's Advocate." See Docket No. 18 at page 23. If the Patient's Advocate wants to convince this court that the OPA's Examining Officers are unbiased, this sort of statement defeats that goal. Forcing a party to defend itself against the Government in the dark and then coaxing this party to admit to a

violation of law in exchange for the potential of a decrease in an arbitrarily-imposed monumental fine, is hardly in compliance with the tenets of due process as we know it.

### 2. Irreparable Harm

For purposes of the exception to *Younger*, irreparable harm is found if the plaintiff has had "the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." <u>Esso</u>, 389 F.3d at 218 (<u>citing</u> <u>Gibson</u>, 411 U.S. at 577.) "The question turns on the type and timeliness of judicial review available." <u>See</u> <u>Esso I</u>, 389 F.3d at 219.

Defendants argue that because the plaintiff "has a second motion for reconsideration pending before the P.R. Supreme Court" there is no immediate injury. <u>See</u> Docket No. 18 at page 16. That might have been the case when the action was filed, but since then, the Supreme Court denied the motion. <u>See</u> Exhibit P of Docket No. 21. The argument is, therefore, moot.

As it happened in the *Esso* cases, MCS HMO has availed itself of the remedies provided at a state level (not once, but twice) and has been unsuccessful. <u>See</u> <u>Esso v. Freytes</u>, 467 F.Supp. 2d at 158 (granting the motion for preliminary injunction after plaintiff sought and was denied interlocutory appeal.) Both the Court of Appeals and the Puerto Rico Supreme Court declined to review the OPA's determinations because they declared themselves without jurisdiction until such time as the OPA issues a final order. We thus adopt the words of the court in *Esso I*, finding that the lack of irreparable harm as defined therein has been "thereby obliterated." <u>Id</u>.

Therefore, the court holds that under these principles, it need not abstain from issuing a judgment on this matter. Both prongs of the *Gibson* bias exception have been met. Having found that *Younger* does not preclude us to intervene, the following step is to analyze whether MCS HMO is entitled to the preliminary injunction it seeks.

### B. Meeting the Preliminary Injunction Test

#### (i)      Likelihood of success on the merits

In its Post-Trial Brief, MCS HMO asserts that it is likely to prevail on its due process claims under the Fifth and Fourteenth Amendment as well as on its claim that OPA's prosecution of the case is arbitrary, capricious and irrational. <u>See</u> Docket No. 21.

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (citing Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)).

To support its claims, the plaintiff readdressed the issues of structural and actual bias; the violations resulting in the denial of MCS HMO's requests for discovery and the excessiveness of the fine. Id. The court has discussed at length the presence of structural and actual bias so there is little need to transcribe our pronouncements.

When an administrative body carries out proceedings that are flawed and unfair, it offends the most basic principles of due process. Lamboy-Ortiz v. Ortiz-Velez, 630 F.3d 228, 240-41 (1st Cir. 2010)(citing Esso v. Lopez-Freytes, 522 F.3d at 145-48 ("As for the Fourteenth Amendment due process claims, an action for deprivation of due process may be brought upon bias infecting administrative proceedings.").

Due process requires an impartial decision maker in administrative adjudications. Marlboro Corp. v. Association of Independent Colleges & Schools, Inc., 556 F.2d 78, 82 (1st Cir. 1977)(internal citations omitted). Puerto Rico's administrative forums have adopted this long-standing principle through Section 3.1 of L.P.A.U., which states, inter alia, that in any formal adjudicatory procedure, an agency must safeguard "[t]he right to impartial adjudication." P.R. LAWS ANN. tit. 3, § 2151(a)(2)(C). Inasmuch as this court has already said that the proceedings before the OPA show a manifest conflict of interest, we must necessarily conclude that plaintiff's claims of due process violations are beyond mere conjecture, at least in light of the record so far.

The same can be said for the challenge MCS HMO poses to the amount of the fine. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality…". Bajakajian, 524 U.S. at 334. From the evidence presented up to this point, the court believes that the OPA was not guided by this principle in setting the amount of the proposed fine.

Defendants provide little factual support to contradict MCS HMO's position. As a matter of fact, their sole claim is that "plaintiff has

accepted most, if not all of the violations detailed herein." See Docket No. 18 at page 21. That statement is strongly refuted by plaintiff. See Docket No. 21.

It suffices to say at this point that MCS HMO has satisfied the likelihood of success on the merits prong.

### (ii)    Likelihood of irreparable harm absent preliminary injunctive relief

In discussing the irreparable harm prong of the *Gibson* bias exception, the court has already touched on some of the issues that are pertinent in this step of inquiry. To require plaintiff to continue before a biased adjudicator would effectively deprive it of its property without due process of law and irreparable injury will thus follow. As we previously expressed, MCS HMO sought and was denied interlocutory relief of its constitutional claims. In the First Circuit's view, no more is needed. See Esso II, 522 F.3d at 146.

Also weighing in favor of a finding of irreparable harm is the inevitability of MCS HMO's cease of operations if the OPA were to collect the proposed $1.7 billion fine. See Docket No. 4 at page 9 ("the proposed $1.7 billion fine is so astronomical that it would probably bankrupt MCS HMO several hundred times over…"). The plaintiff relies on Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009), which holds that even though traditional economic damages generally "do not rise to the level of being irreparable," an exception is found "where the potential economic loss is so great as to threaten the existence of the movant's business." Id. (quoting Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1382 (6th Cir. 1995)).

To boot, the potential for economic harm is compounded by ASES's intention to impose a fine of $19,040,000.00 for the cancellation of the ob-gyn contracts. See *supra* note 7. This forecast, which will self-admittedly lead to MCS HMO's likely bankruptcy, meditates in favor of a showing of irreparable harm. Id. (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996))("In addition, we have held that the irreparable harm requirement may be met upon a showing that 'absent a restraining order, [a party] would lose incalculable revenues and sustain harm to its goodwill.'"

Therefore, we find that MCS HMO has satisfied its burden of showing irreparable harm.

### (iii)   Balancing of harms

Defendants assert that the plaintiff will not suffer any harm if injunctive relief is denied because it will have the chance "to present documentary and testimonial evidence before the hearing examiner, to cross-examine OPA's witnesses, to seek reconsideration of any adverse ruling from the hearing examiner…," and to request appellate review once a final determination is issued. See Docket No. 18. In addition, any claims MCS HMO might have of loss of reputation or good will are "speculative" and "self-inflicted." Id. at page 23.

Defendants state that, on the other hand, to grant the preliminary injunction would have "deleterious effects" on the OPA and the Commonwealth of Puerto Rico because carrying out administrative proceedings in an important exercise of a state's quasi-sovereign right. Id.

We disagree. The issuance of a preliminary injunction will not thwart the OPA's ability to conduct its functions as any remedy will be tailored exclusively to the administrative proceedings in this case. Moreover, the showing of bias in this instance meditates in MCS HMO's favor. A state's exercise of its administrative duties is certainly a significant state interest. But in carrying out those duties, the state must respect the parties' constitutional rights. See Lopez v. Asociacion de Taxis de Cayey, 142 P.R. Dec. 109, 113 (1996).

### (iv)   Effect on the public interest

Like the previous factor, any effect on the public interest is outweighed by the serious constitutional depravations in this case.

### IV.   CONCLUSION

We find that Younger does not forbid us to enter a preliminary injunction because the administrative process before the OPA has been so defective and inadequate as to deprive the plaintiff of due process of law. MCS HMO has met its burden of showing that the OPA is incompetent by reason of bias to adjudicate the issues pending before it. Moreover, after examining the preliminary injunction factors, the court believes that the equities tip in favor of the plaintiff. For those reasons, the motion for preliminary injunction is hereby **GRANTED**. In addition,

defendants Motion to Set Aside Temporary Restraining Order and for Dismissal (Docket No. 18) is **DENIED**.

It is further **ORDERED** that the defendants must immediately suspend any and all administrative hearings and proceedings against MCS HMO related to Case No. 2011-OP-06.

This ORDER shall remain in effect until further notice.

IT IS SO ORDERED.

In San Juan, Puerto Rico, March 17, 2015.

                                        S/ JUAN M. PÉREZ-GIMÉNEZ
                                        JUAN M. PÉREZ-GIMÉNEZ
                                        SENIOR U.S. DISTRICT JUDGE